**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:20-cv-00220-MR**

| | | |
|---|---|---|
| **RANDY W. BARKLEY, Individually** | ) | |
| **and as Executor of the Estate of** | ) | |
| **Rita W. Barkley,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **4520 CORP., INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendant Foster Wheeler

Energy Corporation's Motion for Summary Judgment [Doc. 273]; the

Plaintiff's Motion for Summary Judgment Regarding Defendants' Affirmative

Defenses [Doc. 278]; the Defendant Foster Wheeler Energy Corporation's

Motion to Exclude Opinions of Edwin Holstein [Doc. 291]; the Defendant

Foster Wheeler Energy Corporation's Motion to Exclude Causation Opinions

of Arnold Brody, John Maddox, and Any Other Plaintiff's Expert Based on

the "Every Exposure" Opinion [Doc. 293]; and the Defendant Foster Wheeler

Energy Corporation's Motion to Strike the Affidavit of Richard Fay Carpenter

[Doc. 351].

# I.    PROCEDURAL BACKGROUND

The Plaintiff  Randy W. Barkley, individually and as the executor of the Estate of Rita W. Barkley, brought this products liability action under North Carolina law, alleging that his wife, the decedent Rita W. Barkley, contracted mesothelioma as a result of breathing asbestos dust and subsequently died from this disease.  [Doc. 185: Amended Complaint at ¶ 9].  Specifically, the Plaintiff alleges that, as a child, Ms. Barkley was exposed to asbestos dust from the work clothes of her father, Jack Waugh.  [Id. at ¶ 11].  Waugh worked at various plants throughout the Carolinas, including plants owned by Duke Power, and is alleged to have worked with a number of asbestos-containing materials.  [Id. at ¶¶ 63-64].

Of the 39 defendants originally sued, only Foster Wheeler Energy Corporation ("Foster Wheeler") remains as a defendant.  In his Complaint, the Plaintiff asserts five causes of action against Foster Wheeler: (1) defective design; (2) failure to warn; (3) breach of implied warranty; (4) gross negligence and willful, wanton, and reckless conduct; and (5) loss of consortium.  [Id. at ¶¶ 66-103, 109-11].

Foster Wheeler now moves for summary judgment with respect to all the Plaintiff's claims.  [Doc. 273].  The Plaintiff moves for summary judgment with respect to a number of Foster Wheeler's affirmative defenses.  [Doc.

2

278].  Foster Wheeler further moves to exclude the causation opinions of the Plaintiff's experts.  [Doc. 291, 293].  Finally, Foster Wheeler moves to strike the Affidavit of Richard Fay Carpenter, which was submitted in support of the Plaintiff's response in opposition to Foster Wheeler's motion for summary judgment.  [Doc. 351].

## II.    SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 174, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557,

586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III.   FACTUAL BACKGROUND

Viewing the parties' forecasts of evidence in the light most favorable to the Plaintiff, the following is a recitation of the relevant facts.

Rita W. Barkley was born in 1955.  [Doc. 344-11: Barkley Dep. at 33-34].  She moved out of her parents' home in approximately 1970.  [Id.].  From about 1962 until she left her parents' home in 1970, Ms. Barkley laundered the family's clothes, including her father's work clothes.  [Id.].  She recalled that her father wore his dirty work clothes around the house, only taking them off at bedtime.  [Id. at 36].  She testified that when her father came home from his job at Duke Power, "he would be covered in dusty-looking material on his clothing."  [Id. at 32].

Ms. Barkley's father, Jack Waugh, died as a result of mesothelioma prior to the filing of this present action.  [Id. at 18].  However, Waugh was deposed in a former co-worker's asbestos personal injury action in 1989.[1]  At his deposition, Waugh testified that he worked for Duke, primarily as a

_____

[1] Notably, Foster Wheeler was not a party to that action and thus was not present at this deposition.

carpenter, from 1956 to 1967. [Doc. 344-7: Waugh Dep. at 7-8]. Mr. Waugh worked at Duke's Allen power plant ("Allen") from 1956 to 1961 or 1962.[2] [Id. at 13].

The Duke Allen plant was constructed between 1955 and 1961 and consisted of five different units, all contained within the same large building, which was approximately the size of two football fields. [See Doc. 344-1: Duke Power Service Manual at 7-8; Doc. 344-8: Carpenter Dep. at 84]. Each unit at the plant contained one coal-fired Combustion Engineering boiler and one General Electric steam turbine. [Doc. 344-1: Duke Power Service Manual at 7-8]. Foster Wheeler manufactured and sold steam gland exhausters, which is a piece of equipment that extracts steam used within a steam turbine to seal stages of the steam turbine that cannot receive any infiltration of air to the turbine. [Doc. 344-2: Tracey Dep. at 33-34]. As such, part of its purpose is to cool and condense the steam exiting the turbine. Thus, it is not insulated. [Id. at 34-35]. Foster Wheeler manufactured and sold four steam gland exhausters to General Electric for use in association

---

[2] While the Plaintiff's forecast of evidence shows that Waugh worked at other Duke facilities during his career, the Plaintiff's claims against Foster Wheeler in the present case are based only on his alleged exposure to asbestos while working at the Allen plant. [See Doc. 344 at 19].

with the General Electric turbines located in Units 1-4 of the Duke Allen power plant.[3]  [Id. at 18-19].

When Waugh first went to Duke Allen, the plant was just being built. [Doc. 344-7: Waugh Dep. at 11].  Waugh's main job as a carpenter was to build scaffolding for other trades, including the boilermakers, pipefitters, and insulators.  [Id. at 14, 27].

Shortly after construction of the initial structure at Duke Allen, an insulation contractor came on the job.  [Id. at 11].  Waugh testified that they were using asbestos-containing insulation.  [Id. at 13].  Waugh recalled seeing his co-worker covered in insulation dust from building scaffolding for the insulators.  [Id. at 15-16].  He testified that a lot of dust was created when the insulators sawed the block insulation.  [Id. at 15].  The insulators used several different types of insulation, including mud, blankets, cloth, block, and pipe covering.  [Id. at 15-16].  All types created dust, even the mud when it was sanded after it dried.  [Id. at 16].  Waugh recalled being around the installation of all types of insulation while building scaffolding at Duke Allen. [Id. at 17].  Waugh testified that at one time or another he worked in close vicinity (within 10 to 15 feet) of just about every other worker at Duke while

---

[3] There is no indication in the record as to what type of exhauster was used in Unit 5 of the Allen plant.

building scaffolding. [Id. at 23-24]. Waugh did not testify to working on or around any Foster Wheeler products.

Two of Waugh's co-workers, Richard Carpenter and Bobby Blankenship, were deposed in 2018 in Waugh's asbestos-related wrongful death lawsuit.[4]

Richard Carpenter was an electrician at Duke from 1957 to 1965. [Doc. 344-8: Carpenter Dep. at 12, 20, 25]. He worked with Waugh at the Duke Allen plant from 1959 to 1961. [Id. at 11, 13]. Even though they were not in the same trade, Carpenter saw Waugh at Duke Allen virtually every day. [Id. at 15-16, 33]. When Carpenter started at Allen in 1959, Units 4 and 5 were being built, and the boilers, steam piping, turbines, and generators were being installed. [Id. at 20, 22]. Carpenter observed the insulator contractors insulating the steam pipe, turbines, and boilers. [Id. at 27]. Carpenter testified that all trades worked around each other during the construction of the plant—electricians, carpenters, millwrights, pipefitters, machinists, and insulators. [Id. at 33-34]. Carpenter testified that Waugh worked around the insulators to build scaffolding. [Id. at 33-34].

---

[4] Foster Wheeler was never sued in Waugh's lawsuit and was therefore not present at those depositions.

Carpenter stated that the insulators used blankets on the turbines as well as pipe covering on the steam pipes. [Id. at 37-38]. In his view, insulation of the boilers and steam pipes caused most of the asbestos exposure. [Id.]. Carpenter knew it was asbestos insulation because he had worked around it for so long and there were no other insulating materials available at that time. [Id. at 29, 44-45]. Carpenter testified that when the insulators were working with insulation, dust was created that got into the air and on nearby workers. [Id. at 46, 51]. As for whether dust got on Waugh, Carpenter testified, "I'm sure if he was anywhere close at the time, it did." [Id. at 46]. There were cleanup crews "constantly" sweeping up dust from the insulation, which created more airborne dust. [Id. at 47]. Carpenter did not testify that Waugh did any work on or around Foster Wheeler products at Allen.

Bobby Blankenship worked at Duke from 1951 to 1962, with a two-year break from 1953 to 1955 while he served in the Army. [Doc. 344-9: Blankenship Dep. at 10]. In late 1955, Blankenship began working at Allen, and while he was occasionally given special assignments at other Duke plants, in general he was stationed at Allen until he left Duke in 1962. [Id. at 12-13]. Blankenship recalled only crossing paths with Waugh at Allen. [Id. at 20]. When asked to discuss the times he worked with Waugh at Allen,

Blankenship said, "I didn't work with him," and "[h]e was on another crew." [Id. at 73]. Blankenship, however, recalled generally that carpenters were present while the insulators were working, and were even below the insulators at times. [Id. at 31]. Blankenship stated that the insulators mixed and applied asbestos cement as well as asbestos molded insulation on the equipment. [Id. at 24-25]. He recalled that when the carpenters dismantled the scaffolding, the insulation dust and debris that had collected on the scaffolding was dumped onto the floor. [Id. at 30]. Blankenship did not testify that Waugh did any work on or around Foster Wheeler products at Allen.

## IV. DISCUSSION

As a federal court sitting in diversity, this Court must apply the substantive law of the forum state, including its choice of law rules. Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007). "In tort actions, North Carolina courts adhere to the rule of lex loci and apply the substantive laws of the state in which the injuries were sustained." Connor v. Covil Corp., 996 F.3d 143, 146 n.1 (4th Cir. 2021) (citation omitted). As it is undisputed that Ms. Barkley sustained her alleged injuries while in North Carolina, the Court will apply North Carolina law to the Plaintiff's claims.

In order to survive summary judgment under North Carolina law, a plaintiff in a personal injury asbestos case must present a forecast of

evidence showing actual exposure to the alleged offending products. <u>Wilder v. Amatex Corp.</u>, 314 N.C. 550, 553-54, 336 S.E.2d 66, 68 (1985). Consistent with this standard, the Fourth Circuit has held that a plaintiff must "prove more than a casual or minimum contact with the product containing asbestos in order to hold [the defendant] liable." <u>Jones v. Owens-Corning Fiberglas Corp.</u>, 69 F.3d 712, 716 (4th Cir. 1995) (citation and internal quotation marks omitted). To support a reasonable inference of substantial causation based on circumstantial evidence, the plaintiff must present "evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." <u>Lohrmann v. Pittsburgh Corning Corp.</u>, 782 F.2d 1156, 1162-63 (4th Cir. 1986). "[T]he mere proof that the plaintiff and a certain asbestos product are at the [job site] at the same time, without more, does not prove exposure to that product." <u>Id.</u> at 1162.

To avoid summary judgment, a plaintiff must put forth a showing of admissible evidence that the plaintiff had frequent, regular, and proximate exposure to an asbestos-containing product for which the defendant is legally responsible. <u>Starnes v. A.O. Smith Corp.</u>, Civil No. 1:12-CV-360-MR-DLH, 2014 WL 4744782, at *3 (W.D.N.C. Sept. 23, 2014). Specifically, "the non-movant must bring forth fact-specific and not merely speculative

evidence establishing the cause of her injury." Ross v. F.D.I.C., 625 F.3d 808, 817 (4th Cir. 2010) (citation and internal quotation marks omitted). "[T]he plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough." Id. (internal citations and quotation marks omitted). This can be accomplished through the presentation of "direct evidence which places a plaintiff in contact with an asbestos-containing product, or circumstantial evidence that establishes that plaintiff was in the same vicinity as witnesses who can identify the products causing the asbestos dust that all people in that area, not just the product handlers, inhaled." McDaniel v. John Crane, Inc., No. 1:19CV359, 2021 WL 1111154, at *9 (M.D.N.C. Mar. 23, 2021) (internal citations and quotation marks omitted).

In an effort to meet his burden of presenting a forecast of evidence of frequent, regular, and proximate exposure to an asbestos-containing product by Ms. Barkley's father (and, thus by extension, to Ms. Barkley), the Plaintiff relies upon the prior deposition testimony of Waugh, Blankenship, and Carpenter. All of these depositions, however, were taken in other proceedings to which Foster Wheeler was not a party. For a deposition to

be used against a party in a court proceeding, that party must have been "present or represented at the taking of the deposition or had reasonable notice of it."  Fed. R. Civ. P. 32(a)(1).  Nevertheless, some courts have held that "the presence of an adversary with the same motive to cross-examine the deponent, coupled with a substantial identity of issues between the prior action and the present one, may suffice to permit the use of a deposition from a prior case in a subsequent action."  10A Fed. Proc., L. Ed. § 26:478 (2021) (collecting cases); see Ikerd v. Lapworth, 435 F.2d 197, 205-06 (7th Cir. 1970) ("Although it is generally the rule that a deposition is not admissible as to one not having the opportunity to be represented at its taking, the presence of an adversary with the same motive to cross-examine the deponent and identity of issues in the case in which the deposition was taken with the one in which it is sought to be used provide a well-recognized exception to the rule."); see also Fed. R. Evid. 804(b)(1) (allowing as exception to hearsay rule former testimony of an unavailable witness where testimony is offered against a party where that party or its predecessor in interest had "an opportunity and similar motive to develop" such former testimony).

The Plaintiff argues that the defendants who were present for the depositions of Waugh, Blankenship, and Carpenter had a "similar motive" to

what Foster Wheeler would have had at these depositions, had it been present. [Doc. 344 at 20-21]. Here, however, the Plaintiff is attempting to use these depositions to establish that Waugh had frequent, regular, and proximate exposure to asbestos that can be attributed to *Foster Wheeler* products. While defendants in asbestos litigation often have similar or overlapping interests in developing a record regarding some general subject areas in a fact deposition, such interests generally diverge when the testimony relates to the specific product, service, or premises for which each defendant is being sued. No other defendant present at these depositions would have had any motivation to question the witness about the insulation of Foster Wheeler products or Waugh's interaction with such products. As such, the Court concludes that such testimony cannot be admitted against Foster Wheeler in this present action.[5]

---

[5] The Plaintiff further contends that Foster Wheeler waived any objection to the use of Carpenter's 2018 deposition because the Plaintiff indicated his intent to rely upon that deposition during discovery and because the Plaintiff tendered Carpenter to Foster Wheeler for deposition. [Doc. 344 at 21-22]. The Plaintiff's mere disclosure during discovery of his intent to rely on a deposition (or any other inadmissible evidence) does not trigger any duty on the part of the defendant to immediately assert any objections it may have to that deposition's admissibility. Moreover, the Plaintiff did not tender Carpenter for deposition until well after the close of discovery and after Foster Wheeler had already filed its motion for summary judgment. Under these circumstances, the Court rejects the Plaintiff's argument that Foster Wheeler waived any objections to the use of Carpenter's deposition.

Even if this testimony were admissible against Foster Wheeler, such testimony fails to present a forecast of evidence that Waugh, and therefore by extension Ms. Barkley, ever came into contact with Foster Wheeler-attributable asbestos. Neither Waugh nor his co-workers provided any testimony that Waugh worked on or around Foster Wheeler products at the Allen plant, much less that he was exposed to asbestos from Foster Wheeler products sufficient to meet the frequency, regularity, and proximity requirements of Lohrmann. The Plaintiff attempts to bridge this gap by relying on evidence that Duke required asbestos-containing insulation for all air and gas handling equipment, feed water heating equipment, and piping throughout the Allen facility. [See Doc. 344-6]. In light of this requirement, the Plaintiff argues, that Foster Wheeler exhausters present in Units 1, 2, 3, and 4 of the Allen facility *must have been* insulated with asbestos. And, because this proffered deposition testimony places Waugh near the GE turbines during the time when insulation was being applied to the turbines, the Plaintiff contends, Waugh must have been exposed to the asbestos-containing insulation being applied to the Foster Wheeler exhausters as well.

Critically, however, the Plaintiff has presented no forecast of evidence by any witness who could testify that asbestos-containing insulation was ever applied to the exhausters. Foster Wheeler's corporate representative,

Robert Tracey, testified that the exhausters supplied by Foster Wheeler did not need to be insulated; that Foster Wheeler did not require or specify them to be insulated; and that it would have been counter-productive to insulate them because the purpose of the exhausters was to remove, not retain, heat. [Doc. 344-2: Tracey Dep. at 40, 54].[6]  The Plaintiff offers only a conjectural argument in response.

In an effort to show that the Foster Wheeler exhausters were insulated, the Plaintiff cites to a document entitled "Duke Power Company Allen Plant – Units #3 and #4 Preliminary Outline of Requirements for Heat Insulation." [Doc. 344-6].  Setting aside the fact that this document is, by its very title, a *preliminary* outline, this document does not establish what was *actually* insulated at Allen. In any event, this "Preliminary Outline" never specifically references the insulation of steam gland exhauster systems.  Even if the Plaintiff's forecast of evidence could be construed as raising a plausible inference that the Foster Wheeler exhausters were insulated with asbestos-containing insulation, the Plaintiff has failed to demonstrate that Waugh was

---

[6] The Plaintiff also asserts, citing Mr. Tracey's testimony, that the piping system that connected the exhausters to their associated turbines were insulated with asbestos-containing insulation. [Doc. 344 at 3].  Mr. Tracey, however, testified that he did not know if such pipes were insulated.  [Doc. 344-2: Tracey Dep. at 52].

16

in frequent, regular, and proximate contact with such exhausters at the time they were being insulated.

The Plaintiff also cites to a number of Foster Wheeler documents indicating that Foster Wheeler supplied various valves along with the exhauster system and argues, without support, that these valves would have been insulated with asbestos-containing material. [Doc. 344 at 6]. The Plaintiff again relies upon the erroneous assumption that, since valves for other systems are mentioned in the "Preliminary Outline of Requirements for Heat Insulation," the valves associated with the exhauster systems must also have been insulated. The Plaintiff's argument, again, fails to take into account that the purpose of the exhauster system was to remove heat and condense steam, rather than conserve heat. Despite the Plaintiff's conclusory assumptions, these documents do not show that the Foster Wheeler exhauster systems supplied to Allen were insulated with asbestos-containing materials. In any event, no witness has testified that Waugh was present on a regular and frequent basis when any such valves were insulated.

In an effort to create a genuine dispute of material fact regarding Waugh's exposure to asbestos-containing insulation on Foster Wheeler's products, the Plaintiff submits an affidavit from Richard Fay Carpenter, which

17

affidavit is dated September 27, 2021. [Doc. 344-10]. Foster Wheeler moves to strike this affidavit on various grounds. [Doc. 351].

In his affidavit, Carpenter begins by stating that he worked as an electrician at Allen between 1959 and 1961. [Doc. 344-10: Carpenter Aff. at ¶ 2]. Carpenter then goes on to state that Waugh worked at Allen from 1955 to 1961, and that Waugh worked on Units 1, 2, 3, 4, and 5 and built scaffolds "throughout the boiler and turbine areas of each unit at Duke Allen." [Id. at ¶ 3]. Carpenter then states that each turbine was connected to an "exhauster/condenser," and that Waugh was exposed to insulation dust when each of the turbines and their associated exhausters were insulated. [Id. at ¶ 4].

Carpenter then states in his affidavit as follows:

> The insulation installation process at Duke Allen was immense and took multiple years to complete. During this process, Jack Waugh was around the insulation work the entire time up until all plant units were completely constructed. I have personal knowledge that Jack Waugh was part of the construction and insulation process of each exhauster, heat exchanger, and other piece of equipment associates with the GE turbines and Combustion Engineering boilers in all units at Duke Allen. *Each of this equipment was insulated*, and Jack Waugh was exposed to the insulation dust for nearly the entire time he worked at the plant (1955-61). Mr. Waugh went home every day with all the described dust created from these processes

18

> covered on his clothes and unknowingly brought this
> dust into his home daily.

[Doc. 344-10: Carpenter Aff. at ¶ 5] (emphasis added).

An affidavit submitted to oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed.  R. Civ. P. 56(c)(4).  A summary judgment affidavit "cannot be conclusory or based upon hearsay."  Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996) (affirming the striking of summary judgment affidavit that contained statement not based on personal knowledge) (citations omitted).

While Carpenter purports to have personal knowledge of Waugh's exposure to asbestos during the six years Waugh worked at Allen (1955-1961), Carpenter himself worked at Allen for only two of those years, 1959 to 1961.  Thus, while Carpenter asserts that the insulation process "took multiple years to complete,"[7] and thereby exposed Waugh to insulation dust "for nearly the entire time he worked at the plant," Carpenter clearly lacks any personal knowledge of what occurred prior to when he arrived at Allen.

---

[7] Significantly, Carpenter testified in his 2018 deposition that the insulation process only took place for approximately six months during his two-year tenure at Allen.  [Doc. 344-8: Carpenter Dep. at 56].

Even for the time that Carpenter was actually at the Allen plant, his affidavit fails to demonstrate sufficient personal knowledge for his assertions. For example, Carpenter states that Waugh "went home every day" covered in insulation dust and "unknowingly brought this dust into his home daily." [See Doc. 344-10: Carpenter Aff. at ¶ 5]. Setting aside the issue of Carpenter's lack of knowledge of what occurred prior to him coming to Allen in 1959, Carpenter states no foundation for his assertions about the state of Waugh's clothes or what Waugh did outside the workplace. Additionally, Carpenter states multiple times in his affidavit that Waugh was "frequently, regularly, and proximately" around the insulators and thus was exposed to insulation dust. [See Doc. 344-10: Carpenter Aff. at ¶¶ 3, 4]. Carpenter, however, never quantifies these conclusory statements. Specifically, he never states how many times he observed Waugh around the insulators while they were performing work that created asbestos dust. See Evans, 80 F.3d at 962 (affirming the striking of affidavit containing "self-serving opinions without objective corroboration" as "not significantly probative"). And significantly, Carpenter never states that he personally observed Waugh in

proximity to any Foster Wheeler product at the time that it was being insulated.[8]

Carpenter's affidavit also contains statements which directly and materially contradict his prior sworn deposition testimony. For example, Carpenter states in his affidavit that Waugh was "frequently, regularly, and proximately around the insulators performing insulation *on each of* the units' turbines," [Doc. 344-10: Carpenter Aff. at ¶ 3] (emphasis added), he previously testified in his deposition that he could recall insulation blankets being installed on only *one* of the turbine units, and he could not say where Waugh was in the plant at the time that that occurred. [Doc. 344-8: Carpenter Dep. at 82, 84, 87-88].

An affidavit that contradicts a witness's prior sworn deposition testimony may be disregarded. "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. A genuine issue of material fact is not created where the only issue of fact is to

_____

[8] Significantly, Carpenter states that he was only present at Duke Allen at the end of the installation process (1959 to 1961), yet there is nothing in the record to indicate that the last Unit, #5, contained any Foster Wheeler product.

determine which of the two conflicting versions of the [witness's] testimony is correct." Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) (citation omitted). Here, given the conflicts between Carpenter's affidavit and his prior deposition testimony, as well as the demonstrable lack of personal knowledge for many of his assertions, the Court concludes that Carpenter's affidavit should be disregarded. See Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 976 (4th Cir. 1990) ("Given the conflicts between [the witness's] affidavit and his deposition testimony, the district court was left not with a genuine issue of material fact, but with trying to determine which of several conflicting versions of [the witness's] testimony was correct."). Accordingly, Foster Wheeler's motion to strike is granted.

For all the foregoing reasons, the Court concludes that the Plaintiff has failed to present a forecast of evidence sufficient for a reasonable jury to conclude that Ms. Barkley had frequent, regular, and proximate exposure to an asbestos-containing product for which the Defendant Foster Wheeler is legally responsible.[9]  Accordingly, the Defendant's motion for summary

---

[9] Notably, the Plaintiff has not presented a forecast of evidence that the subject Foster Wheeler products, as manufactured, contained asbestos that caused the decedent's injury.  Rather, the Plaintiff seeks to impose a duty on Foster Wheeler to warn or protect against an injury allegedly caused by the application of asbestos-containing insulation to Foster Wheeler products by third parties, when Foster Wheeler neither manufactured this

22

judgment is granted, and the Plaintiff's claims against this Defendant are dismissed. In light of the Court's ruling on the summary judgment motion, the Plaintiff's motion for summary judgment as to the Defendant's affirmative defenses and the Defendant's motions to exclude the opinions of the Plaintiff's experts are denied as moot.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant Foster Wheeler Energy Corporation's Motion for Summary Judgment [Doc. 273] is **GRANTED**, and all the Plaintiff's claims against Foster Wheeler Energy Corporation are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Defendant Foster Wheeler Energy Corporation's Motion to Strike the Affidavit of Richard Fay Carpenter [Doc. 351] is **GRANTED**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Summary Judgment Regarding Defendants' Affirmative Defenses [Doc. 278]; the

---

insulation nor directed (or even recommended) the application of such insulation to its products. Imposing liability on a product manufacturer for a third-party's application of asbestos-containing insulation *when such insulation is not even called for* by the manufacturer appears to fall well outside the parameters of North Carolina General Statute § 99-B.

Defendant Foster Wheeler Energy Corporation's Motion to Exclude Opinions of Edwin Holstein [Doc. 291]; and the Defendant Foster Wheeler Energy Corporation's Motion to Exclude Causation Opinions of Arnold Brody, John Maddox, and Any Other Plaintiff's Expert Based on the "Every Exposure" Opinion [Doc. 293] are **DENIED AS MOOT**.

**IT IS SO ORDERED.**

Signed: January 26, 2022

Martin Reidinger
Chief United States District Judge

24